## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-60691-Civ-SCOLA

Sabal Palm Condominiums of Pine
Island Ridge Association, Inc.,

      Plaintiff,

vs.

Laurence M. Fischer and Deborah
G. Fischer, *et al.*,

      Defendants.

_____/

# Second Omnibus Order

    The underlying dispute in this case is whether Laurence and Deborah
Fischer, who are residents of Sabal Palm Condominiums of Pine Island Ridge
Association, Inc., may keep a service dog, Sorenson, in their condominium as a
reasonable accommodation under the Fair Housing Act (FHA), 42 U.S.C. §
3601 et seq., to assist Deborah, who has multiple sclerosis and is confined to a
wheelchair.  Deborah requested an accommodation in October 2011 because
Sabal Palm has a no-pets policy.[1]

    The Court recently entered an Omnibus Order (ECF No. 283), which
resolved the pending motions to dismiss as well as some other motions.  The
Court now turns its attention to summary-judgment motions filed by various
parties on the Fischers' counter claims.[2]

    The Fischers brought three counterclaims against Sabal Palm and three
identical third-party claims against Trapani, the attorney, and Marvin
Silvergold, who was (and possibly still is) the President of Sabal Palm's Board of

---

[1] The policy actually provides that no resident may have a pet without the
consent of Sabal Palm's Board of Directors, other than one cat or fish.  (ECF
No. 82-10 at 5.)  But no pet will be permitted that weighs more than 20 pounds
at maturity.  (*Id.*)  Because the pets allowed by the policy do not matter for the
issues in this case, the Court refers to the policy as the no-pets policy.

[2] To the extent that much of the discussion of the facts and legal analysis are
repetitious of the Omnibus Order (ECF No. 283), the Court apologizes.  But
because this Second Omnibus Order disposes of several counts and a party
with prejudice and may be subject to review, the Court again sets forth its
analysis in detail.

Directors.  (ECF No. 82.)  For ease of reference the Court refers to this action as the Amended Counterclaim and to Sabal Palm, Trapani, and Silvergold collectively as Counter Defendants.  Because of the Court's ruling on various motions to dismiss, the Fischers' only remaining claim is that Counter Defendants violated 42 U.S.C. § 3604(f)(3)(B) by refusing the Fischers' request for an accommodation  (refusal-to-accommodate claim).  (*See* ECF No. 283.) The Fischers seek injunctive relief, compensatory and punitive damages, and their attorney fees and costs.  (ECF No. 82.)  With respect to this claim, each Counter Defendant moves for summary judgment while the Fischers move for summary judgment on the issue of liability.  (ECF Nos. 201, 202, 225, 228.) Sabal Palm also moves for summary judgment on its declaratory-judgment action.  (ECF No. 227.)

For the reasons set forth below, the Fischers' summary-judgment motion (ECF No. 225) is **granted in part and denied in part**; Sabal Palm's and Silvergold's summary-judgment motions (ECF Nos. 202, 228) on the Amended Counterclaim and Sabal Palm's summary-judgment motion (ECF No. 227) on its declaratory-judgment action are **denied**; and Trapani's summary-judgment motion (ECF No. 201) on the Amended Counterclaim is **granted**.  With respect to the Fischers' claims, Sabal Palm and Silvergold are liable on the Fischers' refusal-to-accommodate claim, but all claims against Trapani are gone.  The Court will enter an amended scheduling order reopening the period for dispositive motions so that the Fischers can move for summary judgment on the declaratory-judgment action.  In addition, the Court also **denies as moot** the Fischers' motion (ECF No. 209) seeking to fix their failure to respond to the third set of Sabal Palm's requests for admission.

Before proceeding, the Court pauses to note that, according to the Background Paper prepared for a United States Senate Informational Hearing on the subject of fake service dogs (hereafter, the "Background Paper"),[3] there is a growing problem of people using fake service dogs, which has a "profound" and negative effect "on the disabled, business and medical communities, and the airline industry."  Background Paper at 11; *accord* Background Paper at 1-2, 11, 13.  And after the court in *Auburn Woods I Homeowners Association v. Fair Employment and Housing Commission*, 121 Cal. App. 4th 1578[, 1582, 1584-85, 1599 (2004), held that "a homeowner's association had discriminated against condominium residents, a married couple who suffered from

---

[3]  The Background Paper can be found online at the following website: http://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/Background%20Paper %20for%20Fake%20Service%20Dog%20Hearing%20%282-14-14%29.pdf   (last accessed on March 18, 2014).

depression and other disorders, in failing to reasonably accommodate their disabilities by permitting them to keep a small companion dog . . . the number of housing disability cases involving companion or comfort animals as a reasonable accommodation has soared." Background Paper at 10-11.

As the Court noted in the Omnibus Order (ECF No. 283), there is some reason to be skeptical of requests to keep a dog as an accommodation for a disability in certain cases, particularly cases where the dog assists the disabled person by rendering emotional support. But this is not such a case. It is undisputed that Deborah has a bona fide physical disability that has severe physical symptoms. And her *specially trained* service dog does not assist her by providing emotional support: it assists her by helping her complete physical tasks that her physical disability makes difficult. That Counter Defendants turned to the courts to resolve what should have been an easy decision is a sad commentary on the litigious nature of our society. And it does a disservice to people like Deborah who actually are disabled and have a legitimate need for a service dog as an accommodation under the FHA.

## Background

Because the bulk of the analysis focuses on the Fischers' refusal-to-accommodate claim, familiarity with the FHA provisions undergirding this claim should help the reader put the facts below into the proper legal framework. The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."[4] 42 U.S.C. § 3604(f)(2). Prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled person an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B).

In October 2011, Deborah notified Sabal Palm by letter that she was bringing home a trained service dog to assist her with her tasks of daily living. (ECF No. 82-1 at 2.) She obtained the dog from Canine Companions for Independence (CCI). (*Id.*) In early November 2011, Sabal Palm through its attorney Trapani informed Deborah that it was treating her letter as a request

---

[4] Although the FHA uses the term *handicap* rather than *disability*, both terms have the same legal meaning: the definition of *disability* in the Americans with Disabilities Act "is drawn almost verbatim" from the definition of *handicap* "contained in the Fair Housing Amendments Act of 1988. Congress' repetition of a well-established term [implies] that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

for an accommodation.  (ECF No. 82-2 at 2.)  Despite asserting that the law authorized it to make only a "reasonable inquiry" of Deborah to determine whether she was entitled to the accommodation, Sabal Palm requested extensive documentation.  (*Id.*)  It requested that Deborah produce copies of her medical records from *all* of her healthcare providers who diagnosed or treated the disability that she claimed made a service dog necessary.  (ECF No. 82-2 at 2.)  In addition, Sabal Palm requested that she provide "*all* documents relating to the nature, size and species of dog, as well as all documents regarding any training it received."  (*Id.* (emphasis added).)

Deborah replied to this letter in early December 2011.  (ECF No. 82-4 at 2.)  She provided a link to the May 2004 Joint Statement issued by the Department of Housing and Urban Development (HUD) and the Department of Justice (DOJ), entitled *Reasonable Accommodations Under The Fair Housing Act* (hereafter, the "Joint Statement").[5]  (*Id.*)  Based on the Joint Statement, she contended that she did not have to provide medical records to substantiate her accommodation request to keep Sorenson, her dog.  (*Id.*)  To show the tasks that Sorenson was trained to assist her with, she attached a letter from Lori Lindsay, the Southeast Regional Program Manager/Instructor at CCI. The letter reads thus:

> This is *to certify* that Sorenson, tattoo number 2009218, is a Canine Companions for Independence assistance dog.  He is placed with Deborah Fischer of Davie, FL.  Sorenson *is trained to assist Deborah* by retrieving items, opening and closing doors and turning light switches on and off.  Deborah and Sorenson graduated from our Southeast Regional Training Center on November 11, 2011.  If you need further information, please do not hesitate to contact me at [phone number].

(ECF No. 82-3 at 2 (emphasis added).)  She also attached a picture of "[her] in [her] wheelchair with [her] service dog[] to provide documentation of [her] visible handicap for any board member not familiar with the physical nature of [her] disability."  (ECF No. 82-4 at 3.)

A few days later Trapani responded by email, contending that the information Deborah provided was insufficient and asking for more:

> The Association is aware of your apparent disability.  However, the Ass[ociatio]n has the right and the obligation to verify that you have a medical need for a dog that weighs in excess of 20 pounds.

---

[5] The web site http://www.hud.gov/offices/fheo/library/huddojstatement.pdf (last accessed on March 18, 2014) contains the Joint Statement. The Joint Statement is written as a series of questions and answers.

> Given that several requests were made of you provide certain specific information, and given your refusal to provide it, the Association will have no choice but to consider your request for an accommodation based on the little information it has.

(ECF No. 82-5.)  So the next day (December 7), Deborah provided Sabal Palm a medical history form completed by her primary-care doctor, Leslie Herzog. (ECF No. 82-6 at 2-8.)  Herzog completed this form in January 2010 as part of Deborah's application for a service animal through CCI.  (*Id.* at 3-8.)  The form provides copious information, including the following: that one purpose of the form is to determine the applicant's (i.e., Deborah's) suitability for having a service dog placed with her; that Herzog has been a physician to Deborah since October 2003; that Herzog last examined Deborah in January 2010 on the same day Herzog completed the form; that Deborah has multiple sclerosis; that she is confined to a wheelchair; that she suffers from a "loss of strength, balance, [and] coordination" in all of her extremities (including her hands); that she requires attendant care on a regular basis for "all aspects of daily living"; and that she is a "good candidate" for a service dog through CCI.  (*Id.*)  This information shows that Deborah is disabled, that she needs assistance with "all aspects of daily living," and that she is a good candidate for a service dog, which clearly implies that a service dog would help with her disabilities.  (*See id.*)

Based on this medical-history form and the letter from the dog-training professional detailing Sorenson's training, one could not reasonably doubt that Deborah was disabled; that her disability would negatively impact her ability to use and enjoy her residence; and that having Sorenson as an accommodation would help ameliorate the effects of her disability.  The tasks that Sorenson is specifically trained to assist Deborah with make sense given Deborah's disability of multiple sclerosis and the symptoms of that disability.  It is obvious that a service dog trained to open and close doors, turn on and off lights, and retrieve items could help a person (1) who suffers from a loss of strength and coordination in her arms and hands and (2) who is so disabled that she requires attendant care on a regular basis with all aspects of daily living.

Yet even after receiving information that should have been dispositive, Sabal Palm took the position in a February 2012 letter that it needed more information.  (ECF No. 82-7 at 2.)  Sabal Palm contended that she had not substantiated her need for a service dog: "you have not provided the Board with any medical records substantiating your need for the dog." (ECF No. 82-7 at

2.)   So later in February 2012, Deborah gave them even more medical information substantiating her need for a dog.  (ECF No. 82-8 at 2-11.)

All of these additional medical records tell a consistent story: Deborah's multiple sclerosis renders her severely disabled and requires that she have the assistance of others to maximize her functional status.  The descriptions of the symptoms of her disability in these documents make it clear that a service dog trained to help retrieve items, open doors, and turn light switches on and off would help ameliorate the effects of her disability.

A "treating source neurological questionnaire" completed by Herzog in July 2009 stated that Deborah had multiple sclerosis with the following symptoms: decreased grip strength; decreased ability to perform fine manipulation, decreased ability to perform gross manipulation; gait disturbance; sensory loss; motor loss; spasticity; severe fatigue; malaise; and substantial muscle weakness on repetitive activity.  (ECF 82-8 at 11.)  Herzog elaborated: "Pt. [patient] with progressive exacerbations of condition—requires assistance of another with all ADLs [Activities of Daily Living] as well as with any transferring from wheelchair to another site[.]  Pt. [patient] has significant loss of function of upper and lower extremities, muscle control, [and] strength.  She suffers from fatigue."  (*Id.*)  The form also indicates that Deborah is wheelchair bound: "Pt [patient] is unable to ambulate or stand alone or with a handheld device.  She requires the assistance of another individual to transfer from her wheelchair/scooter."  (*Id.*)  Deborah's grip strength was rated as 2/5, and her lower-extremity strength as 1/5.  (*Id.*)

A "home health certification and place of care" form signed by Herzog in July 2011 diagnoses Deborah with multiple sclerosis, wheelchair dependence, and debility (feebleness, weakness, or loss of strength).  (*Id.* at 3.)  It further states that "patient cannot safely leave home without assistance.  Due to [patient's] health status, [patient] is homebound, and therefore requires nursing care in the home.  Home healthcare is medically necessary to maximize [patient's] functional status."  (*Id.*)

The most recent medical record is a "group disability insurance attending physician's statement" completed by Herzog in August 2011.  (*Id.* at 5-7.)  Deborah is diagnosed with multiple sclerosis, debility, and wheelchair dependence.[6]  (*Id.* at 5.)  Deborah has "neurological deficits of extremities," cannot ambulate, cannot drive, "will not be able to *ever* return to [the] workforce," and "needs assistance [with] ADLs [activities of daily living]."  (*Id.* at

---

[6] The form states that Deborah was first diagnosed with multiple sclerosis in 2001 and that the date she experienced a significant loss of function was July 2009.  (*Id.* at 5-6.)

6.)    The job category that best describes Deborah's functional status is "sedentary," which means that she can lift, at best, "negligible weight."[7]  (*Id.* at 7.)

This still wasn't enough for Sabal Palm.  Almost two months later, Sabal Palm instituted the declaratory-judgment action.   In a letter sent to the Fischers by Trapani on behalf of Sabal Palm just a few days after Sabal Palm sued, Sabal Palm relayed, in relevant part, the following: that it is undisputed that Deborah is disabled; that it is undisputed that her request to keep Sorenson "would not involve an extraordinary expense on the part of [Sabal Palm]"; that Sabal Palm believed the records provided thus far were insufficient to entitle Deborah to a dog as an accommodation under the FHA; that Sabal Palm believed that it was within its legal rights to deny the accommodation and require Deborah to remove Sorenson; that Sabal Palm "recognize[d] that whether, and under what circumstances, accommodations to disabled persons are required is an evolving issue under the law"; that Sabal Palm therefore instructed Trapani to bring the declaratory-judgment action; and that while the lawsuit is pending, Deborah could "temporarily keep" Sorenson.  (ECF No. 82-9 at 2-3.)

# Analysis

## A.    Summary-judgment standard

Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rule 56 of the Federal Rules of Civil Procedure requires a court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

---

[7] Because there was no box below "sedentary" on the form, Deborah's limitations may exceed those described in the "sedentary" box.  Hence the conclusion that she can lift negligible weight at best.

**B.     The refusal-to-accommodate claim**

**1.     *Overview of the Court's analytical approach***

The Court sets forth the law more fully below, but here is a primer of the Court's reasoning.  The materials Deborah submitted to Sabal Palm before it sued were more than sufficient to show that she was entitled to keep Sorenson as a reasonable accommodation under the FHA.   These materials unquestionably establish that Deborah is severely disabled, that some of the symptoms of her disability make it harder for her to grab and manipulate items with her hands than it is for a nondisabled person, and that Sorenson is trained to assist Deborah with several tasks that would require her to grab or manipulate items with her hands.  Because these materials show that Deborah has a need for an accommodation and clearly connect her disability-related need to Sorenson's skills, and because a service dog is a reasonable accommodation, Sabal Palm should have granted Deborah's request for an accommodation.

There was no need for Sabal Palm to wait more than 4 months after receiving the first materials in December 2011 to reach a decision on the accommodation.   And even after waiting four months and receiving more materials substantiating Deborah's accommodation request, Sabal Palm got it exactly—and unreasonably—wrong.  Sabal determined that it could lawfully deny her request for an accommodation and sued to get this Court to tell it whether it was right: the undisputed evidence is that Sabal Palm's Board of Directors unanimously voted against granting Deborah's accommodation request.  (ECF No. 219-1 at 124, 175, 187.)  But Sabal Palm decided to postpone enforcing this decision until a Court would rule whether its decision was correct.  (ECF Nos. 219-1 at 175; 82-9 at 2-3.)  No matter how one labels Sabal Palm's conduct—whether it is referred to as delaying making a decision or whether it is referred to as making a decision but declining to enforce that decision—the Court's outcome is the same.[8]   A reasonable factfinder would have to conclude that Sabal Palm violated § 3604(f)(3)(B) when it failed to simply grant Deborah's accommodation request.

So this case can be decided solely based on the records that Deborah provided to Sabal Palm before Sabal Palm sued.  Given the circumstances of the present case, that is as it should be.  When the person requesting an

---

[8] Because Sabal Palm has declined (for now) to enforce its decision and has allowed Deborah to temporarily keep Sorenson while the suit is pending, it has not actually denied her request.  For ease of reference, and because a ruling is typically coupled with enforcement, the Court refers to Sabal Palm's conduct as delaying making a decision on the Fischers' accommodation request.

accommodation provides enough reliable information such that the only reasonable conclusion is that the accommodation request should be granted, the housing provider's denial of the request or undue delay in making a decision violates the FHA (specifically, § 3604(f)(3)(B)).

Besides, the additional discovery-related information would not change the result even were the Court to consider it. The same picture emerges after considering this information: Deborah is disabled and her disability makes it more difficult for her to grab and manipulate things than for a nondisabled person. To be sure, she can do some things with her hands. But it is beyond dispute that her ability with her hands (and arms and legs) is far less than a nondisabled person's. It is also beyond dispute that the tasks Sorenson would assist her with would help lessen this inequality, thereby making Sorenson a necessary accommodation for purposes of the FHA. Moreover, the new information does not change the conclusion that Sorenson is a reasonable accommodation. So whether the new information is considered or not, Deborah is entitled to her requested accommodation under the FHA.

### 2.    Counter Defendants' evidentiary challenge

Before analyzing the merits of the Fischers' refusal-to-accommodate claim, the Court must address an evidentiary issue. Counter Defendants appear to argue that the Court cannot consider the medical records Deborah provided before Sabal Palm sued because the records are not properly authenticated. (ECF Nos. 263 at 3; 269 at 4.) But in other places, Counter Defendants assert that these same records are "true and correct." (ECF Nos. 263 at 5-6; 269 at 5-6.) Even if Counter Defendants have not effectively conceded that these records are what they purport to be, the Court can still consider them on summary judgment. Unauthenticated hearsay statements may be considered on summary judgment when the statements could be "reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Leslie Herzog, Deborah's treating physician, signed the forms and would be able to authenticate them or introduce the same evidence at the trial through her testimony. So the Court can and will consider these records in ruling on the various summary-judgment motions.

### 3.    The merits of the claim against Sabal Palm

The Fischers claim that Sabal Palm, Silvergold, and Trapani all failed to reasonably accommodate Deborah's disability by refusing her request to allow

her service dog, Sorenson, to live with her. [9]  The Court agrees with respect to Sabal Palm and Silvergold.  The Court **grants** the Fischers summary judgment against these Defendants and **denies** them summary judgment against Trapani.  Trapani's summary-judgment motion is **granted**; Silvergold's and Sabal Palm's motions are **denied**.  Because determining whether Silvergold and Trapani are liable presents additional issues, the Court discusses their liability after analyzing Sabal Palm's.

The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2).  "Such discrimination includes 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Overlook Mutual Homes, Inc. v. Spencer*, 415 F. App'x 617, 620-21 (6th Cir. 2011) (quoting 42 U.S.C. § 3604(f)(3)(B)).  "To prevail on a [§] 3604(f)(3)(B) claim"—that is, a claim that a housing provider refused to reasonably accommodate a disability—"a plaintiff must establish that (1) he is disabled or handicapped within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) such accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the requested accommodation." *Hawn v. Shoreline Towers Phase 1 Condominium Association, Inc.*, 347 F. App'x 464, 467 (11th Cir. 2009).  An accommodation can also be constructively denied by delaying making the decision. *Overlook*, 415 F. App'x at 620; Joint Statement at 9, 11.  The Court addresses each of the four elements in turn.

It is undisputed that Deborah is disabled within the meaning of the FHA. The first element of her claim is satisfied.

The second element is also met: in requesting that she be allowed to keep Sorenson and be exempted from Sabal Palm's no-pet policy, Deborah requested a reasonable accommodation.  An accommodation is not reasonable "if [1] it would impose an undue financial and administrative burden on the housing provider or [2] it would fundamentally alter the nature of the provider's operations."[10]  Joint Statement at 7; *accord Schwarz v. City of Treasure Island*,

---

[9] The other claims asserted in the Fischers' Amended Counterclaim were dismissed by the Court.  The refusal-to-accommodate claim is the only claim that remains and the only claim that the Court considers on summary judgment.

[10] Although the Joint Statement is a policy statement rather than "an authoritative interpretation of § 3604" that binds courts, the Joint Statement "may, of course, have the power to persuade." *Overlook*, 415 F. App'x at 621

544 F.3d 1201, 1220 (11th Cir. 2008) (determining that an accommodation is unreasonable "if it either [1] imposes undue financial and administrative burdens on a grantee or [2] requires a fundamental alteration in the nature of the program" (internal quotation marks omitted) (brackets in original)). Because Sabal Palm admits that it is "undisputed that [Deborah's] request for an accommodation would not involve an extraordinary expense on the part of [Sabal Palm]," the Court need consider only whether allowing Deborah to keep Sorenson would fundamentally alter the nature of Sabal Palm's program. (ECF No. 82-9 at 2.) "A fundamental alteration is a modification that alters the essential nature of a provider's operations." Joint Statement at 8 (internal quotation marks omitted); *accord Schwarz*, 544 at 1220 ("A proposed accommodation amounts to a 'fundamental alteration' if it would eliminate an essential aspect of the relevant activity."). Sabal Palm is a condominium association. Its *raison d'être* is to provide housing. Allowing a disabled resident to keep a service dog would not fundamentally alter Sabal Palm because Sabal Palm would still be able to offer housing. Sabal Palm does not even argue to the contrary.

The governing regulation buttresses this conclusion. The companion regulation to 42 U.S.C. § 3604(f)(3)(B) is 24 C.F.R. § 100.24(a), and this regulation specifically provides that it is unlawful for a housing provider with a no-pets policy to refuse to permit a blind person to live in a dwelling unit with a seeing-eye dog. 24 C.F.R. § 100.24(b)(1). Because an essential element of both § 3604(f)(3)(B) and § 100.24(a) is that the accommodation be reasonable, it follows that allowing a disabled person to keep a dog in a housing unit with a no-pets policy is a reasonable accommodation.

The undisputed facts also satisfy the third element of necessity as a matter of law. A housing provider is required to make a reasonable accommodation "*only* if it 'may be necessary to afford [a disabled resident of Sabal Palm an] equal opportunity to use and enjoy a dwelling.'" *Schwarz*, 544 F.3d at 1225 (quoting 42 U.S.C. § 3604(f)(3)(B)).[11] "To show that a requested

---

n.3 (internal quotation marks omitted). The Sixth Circuit clearly found the Joint Statement highly persuasive. This Court finds the Joint Statement highly persuasive too.

[11] Some courts have read the necessity element as requiring a disabled person to show that the accommodation *was* necessary instead of that it *may be* necessary. There is a large and plain difference between the conditional language of the statute (*may be*) and the definite language (*was*) of some courts. Since the plain language of a statute controls, it follows that the required showing should be conditional. But since the undisputed facts in the present case are so one-sided on the necessity element in Deborah's favor, even

accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability." Joint Statement at 6.

No rational factfinder could dispute that Sorenson is necessary for Deborah to have an equal opportunity to use and enjoy her dwelling. The symptoms of her disability make it difficult for her to grab and manipulate items and they require that she have assistance in all activities of her daily life. So it follows that a service dog trained to retrieve items, open and close doors, and turn light switches on and off would help alleviate some of the negative effects of her disability. Because Deborah provided unrebutted and undisputed medical and dog-training records substantiating her need for a service dog with Sorenson's training, necessity exists as a matter of law.

One additional argument under necessity deserves attention. In addition to arguing that a service dog is not a reasonable or necessary accommodation, Sabal Palm also appears to argue that even if a dog is reasonable or necessary for Deborah, a dog over 20 pounds is not reasonable or necessary. (*See* ECF No. 129 at 6-7; ECF 82-9 at 2.) This argument is unpersuasive. Sabal Palm offers no evidence that a smaller dog could have met Deborah's needs. A dog under 20 pounds is a small dog. So given the height of the average door handle and light switch, a small dog will have a harder time opening and closing doors and turning light switches on or off. And there will be some items a small dog cannot retrieve because of the item's height that a bigger dog would be able to retrieve. Moreover, given the height of a person in a power wheelchair, a smaller dog will have a harder time retrieving items effectively for the disabled person.

This is not just commonsense—though it most certainly is that. Deborah also wrote in an email to Trapani that, "regarding the size of my dog—the dog is matched to the height of my chair, which enables him to assist me better with his jobs, i.e. picking up items I have dropped." (ECF No. 82-6 at 2.) She also attached a picture of her in her power wheelchair with Sorenson. (ECF No. 82-4 at 3.) In the picture, the dog's size fits well with the height of her in the wheelchair. (*See id.*)

Deborah's statement regarding Sorenson being sized appropriately for her wheelchair is credible. It accords with common sense. And the picture she provided to Sabal Palm supports her statement.

---

when interpreting this element as requiring a definite showing, the Court need note resolve the conflict between the statute's plain language and some court's interpretation of that language.

But the most fundamental problem with the argument that a dog over 20 pounds was not necessary is that it gets the law wrong. Sabal Palm's implied argument—that even if a dog is reasonable or necessary for Deborah, a dog 20 pounds or under would suffice—is akin to an argument that an alternative accommodation (here, a dog under 20 pounds), would be equally effective in meeting Deborah's disability-related needs as a dog over 20 pounds. The Joint Statement's comments on alternative accommodations proposed by the housing provider are highly persuasive and useful in evaluating this argument.

> There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. *However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.*

Joint Statement at 8 (emphasis added). Since a dog over 20 pounds is a reasonable accommodation, Deborah's (commonsense) belief that a dog over 20 pounds—in particular, a dog of Sorenson's size—is better able to assist her renders the need to evaluate alternative accommodations unnecessary as a matter of law.[12] That a blind person may already have a cane or that he or she could use a cane instead of a dog in no way prevents the blind person from also obtaining a seeing-eye dog as a reasonable accommodation under the FHA. A contrary result is absurd.

The point is underscored by the April 2013 HUD Statement entitled *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs* (hereafter, the "HUD Statement").[13] That Statement

---

[12] The conclusion that Sorenson is better able to assist her is also supported by the letter from the dog-training professional at CCI. (*See* ECF No. 82-3 at 2.) The letter shows that in that person's professional judgment, Sorenson will assist Deborah. (*Id.*)

[13] The HUD Statement can be found online at the following website: file:///C:/Documents%20and%20Settings/rmeyers/My%20Documents/Downloads/servanimals_ntcfheo2013-01.pdf (last accessed on March 18, 2014). Although the HUD Statement, like the Joint Statement, is a policy statement rather than "an authoritative interpretation of § 3604" that binds courts, the HUD Statement "may, of course, have the power to persuade." *Overlook*, 415

provides that "[b]reed, size, and weight limitations *may not* be applied to an assistance animal." HUD Statement at 3.

The final element is whether Sabal Palm constructively denied Deborah's request to keep Sorenson. Here again, the evidence is so one-sided that Deborah prevails as a matter of law.

To understand why requires a close analysis of *Overlook*, a case with a procedural posture similar to the present case analyzing this precise issue (i.e., constructive denial). Although *Overlook* rejected the refusal-to-accommodate claim at issue in that case, the reasoning of *Overlook* demonstrates that the Fischers' prevail on their claim as a matter of law.

In *Overlook*, the Spencer family resided in Overlook, which had a no-pets policy. 415 F. App'x at 618. The Spencers adopted a dog, Scooby, in 2005, and though they admitted that Scooby was not originally prescribed by a medical professional, they maintained that Scooby had a calming effect on their daughter, Lynsey, who suffered from anxiety disorder. *Id.* In 2007, the Spencers formally requested that they be allowed to keep Scooby as an accommodation under the FHA. *Id.* Following this request, a series of letters was exchanged between Overlook and the Spencers,[14] in which Overlook asked for information documenting Lynsey's disability and her need for Scooby. The Spencers provided some of the information Overlook requested. *Id.* at 618-19. More specifically, on the eve of the suit, the Spencers had provided the following information: "a letter from Lynsey's psychologist, stating that she had evaluated Lynsey and recommended a service dog"; a form providing the name of Lynsey's psychologist; an explanation that Scooby was not a specially trained service animal, but rather a companion animal that provided emotional support and companionship; statements from the Spencers themselves or other nonmedical personnel that Lynsey suffers from "anxiety disorder, neurological & emotional conditions" that affect "her ability to care for herself and learn, both of which are . . . recognized as major life activities"; and that Scooby "ameliorates the effects of Lynsey's condition through its presence and

---

F. App'x at 621 n.3 (internal quotation marks omitted). The principles in the HUD Statement are in accord with the principles in the Joint Statement, which the Sixth Circuit found persuasive in *Overlook*. Just as the Court found the Joint Statement highly persuasive, the Court also finds the HUD Statement highly persuasive.

[14] The Spencers often acted through their attorney or the president of a local fair-housing center. For simplicity, references to the Spencers will also include communications made by these representatives. Significantly, neither the Spencers, their attorney, nor the president of the local fair-housing center, Jim McCarthy, were medical or dog-training professionals. *See id.* at 618-19.

interaction with her." *Id.* (internal quotation marks omitted). By the time Overlook filed suit, it had requested but still not received the following information: "a diagnosis of Lynsey's medical condition"; contact information for Lynsey's medical providers; "a description of the treatment Lynsey was receiving"; and Lynsey's school and medical records by way of a signed release that would allow Overlook to obtain these records. *See id.* at 618-19. At various points, Overlook also requested a description of the dog's training and of the services it provided, but information responsive to this request was furnished when the Spencers informed Overlook that Scooby had received no special training and that he ameliorated the effects of Lynsey's condition by being present and interacting with her. *See id.*

Overlook did not make an official decision on the Spencers' accommodation request, nor did it begin eviction proceedings; it instead sued "for a declaratory judgment that it was not required to make the requested accommodation." *Id.* at 619. In response, the Spencers counterclaimed, alleging, among other things, that Overlook had refused to reasonably accommodate Lynsey's disability in violation of the FHA. *Id.* The case proceeded to trial and after the evidence had been presented, the district court entered judgment as a matter of law for Overlook on the Spencers' refusal-to-accommodate claim, reasoning that "they had presented insufficient proof that Overlook had actually denied their request for a reasonable accommodation." *Id.* at 620.

On appeal, the Sixth Circuit framed the question thus: "whether the district court erred in holding that, as a matter of law, Overlook did not constructively deny the request for a reasonable accommodation by delaying making a decision on the request, requesting school and medical records, and filing suit for a declaratory judgment." *Id.* at 620. Put more simply, the issue was "whether a reasonable jury could find that Overlook 'refused' to make the accommodation requested." *Id.* at 621.

The Court looked at three factors in analyzing the issue: (1) the extent to which the housing provider delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit; (2) the state of the law at the time the suit was filed; and (3) whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation. *See id.* at 621, 623. In setting forth the principles relevant to the first factor, the Court relied heavily on the Joint Statement. *Id.* at 621-22. Because those principles are directly relevant to the present case, the Court quotes the Sixth Circuit at length:

[A] housing provider "has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." Joint Statement at 11.  Moreover, the Joint Statement states that a "failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation." *Id.* at 9.

A housing provider, however, is entitled to seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation.  According to the Joint Statement,

> In response to a request for a reasonable accommodation, a housing provider may request *reliable* disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability, (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.

*Id.* at 13.  This inquiry need not be highly intrusive.  "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary . . . ." *Id.* at 13–14.

*Overlook*, 415 F. App'x at 621-22 (emphasis added).

With respect to the adequacy of the information that the Spencers provided to support their accommodation request, the Court's reasoning was nuanced: "Overlook was entitled to additional information," but "[a]t the same time, Overlook was probably not entitled to the broad access to confidential medical and school records it demanded." *Id.*  The additional, *reliable* information that Overlook was entitled to receive related to (a) verifying that Lynsey was disabled and (b) showing the relationship between Lynsey's disability and the need for the requested accommodation. *See id.* (For ease of reference, the Court will refer to information relating to these two categories as qualifying-disability information and nexus information, respectively.)  Because Overlook had never received reliable information relating to either of these two categories, Overlook was not able "to verify that a qualifying disability existed or that the proposed accommodation was related to the disability." *Id.*

The letter from Lynsey's treating psychologist did not suffice because it "merely stated that Lynsey was receiving 'psychological counseling services' and required a 'service dog.'" *Id.*  Information from a treating psychologist

would ordinarily be reliable.  *See* Joint Statement at 13-14 ("A doctor or other medical professional . . . who is in a position to know about the individual's disability may also provide verification of a disability.").  But the psychologist's letter in *Overlook* did not state that Lynsey suffered from a disability—let alone identify what that disability was—and it did not show the relationship between the assistance the dog could provide and the unspecified problems for which Lynsey was receiving counseling.  *See Overlook*, 415 F. App'x at 622.  (Another way to express this last point is that the letter did not show how or explain why a service dog helped with Lynsey's unspecified problems.)  So it did not provide any qualifying-disability and nexus information.  *Id.*

The court also found insufficient the statements from the Spencers and McCarthy, the president of the local fair-housing center: "[e]ven after receiving [this information], Overlook was entitled to additional information."  *Id.* at 622. Unlike the information from the treating psychologist, who provided no qualifying-disability and nexus information, the information provided by the Spencers and McCarthy was qualifying-disability and nexus information, and it was specific and detailed: they informed Overlook that Lynsey suffered from and was being treated for anxiety disorder, neurological conditions, and emotional conditions; that these ailments impacted Lynsey's ability to care for herself and learn; that Scooby provided emotional support and companionship to Lynsey; and that Scooby ameliorated the effects of these conditions by being present and interacting with Lynsey.  *See id.* at 618-19, 622.  So the court did not find this information inadequate because it lacked detail or specificity.  *See id.* at 622.  Indeed, the court adopted the principles from the Joint Statement that a housing provider's inquiry to obtain reliable qualifying-disability and nexus information "need not be highly intrusive" and that, "[i]n most cases, an individual's medical records or *detailed information* about the nature of a person's disability *is not necessary*."  *Id.* (internal quotation marks omitted) (relying on Joint Statement at 13-14.)  And since the information was manifestly qualifying-disability and nexus information, the Court could not have found that the Spencers failed to provide information on these subjects to Overlook.  *See id.*

The only remaining basis on which the Court could reject this information as it did would be that the information was not sufficiently reliable. Neither the Spencers nor McCarthy were medical or dog-training professionals. That matters because Lynsey's alleged disability was an internal condition that would not be readily apparent to a lay observer.  So the Spencers' and McCarthy's statements about the disability Lynsey allegedly suffered from and about how and why Scooby helped ameliorate this disability were unreliable in

light of the facts.  They were lay observers who were not qualified to diagnose Lynsey or pronounce how a dog helped her.

The nature of Lynsey's putative disability and the Joint Statement buttresses this conclusion.  Lynsey's disability was not obvious.  Unlike a person with a physical disability, such as someone confined to a wheelchair, Lynsey's disability was internal.  Similarly, her need for the requested accommodation was not readily apparent.  The Joint Statement provides that when a disability is readily apparent, the housing provider may not request additional information about the requestor's disability.  Joint Statement at 12-13.  So too with the requestor's disability-related need for the accommodation.  *Id.*  That is, if it is readily apparent how the requested accommodation would help alleviate the difficulties posed by the disability, then the provider may not request additional information concerning the need for the requested accommodation.  *Id.*  It is only when either the requestor's disability or the disability-related need for the accommodation are not obvious that the provider may request reliable qualifying-disability or nexus information.  *Id.*  And even then, the provider's queries are limited to precisely what is not obvious.  An example in the Joint Statement illustrates the point:

> A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep assistance dog in his unit even though the provider has a "no pets" policy.  The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider.  The housing provider may ask the applicant to provide information about the disability-related need for the dog.

*Id.* at 13.  This example is contained in the Joint Statement's answer to the following question: "[w]hat kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?"  Joint Statement at 12.  Moreover, the rule *Overlook* borrowed from the Joint Statement providing that a housing provider may request reliable qualifying-disability and nexus information, as well as information "describ[ing] the needed accommodation," is predicated on the disability in question not being readily apparent, just as the disability in *Overlook* was.  That is so because the rule is provided in the Joint Statement's answer to this question: "[i]f a disability *is not obvious*, what kinds of information may a housing provider request from the person with a disability in support of the requested accommodation?"  Joint Statement at 13 (emphasis added).

Since neither Lynsey's disability nor her need for a dog were readily apparent, Overlook was entitled to seek reliable qualifying-disability and nexus

information.  But even then, the Sixth Circuit reasoned that "Overlook was probably not entitled to the broad access to confidential medical and school records it demanded."  *Overlook*, 415 F. App'x at 622.  Adding teeth to this conclusion, the Sixth Circuit recognized that "[i]n some circumstances, a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process."  *Id.*  Finding that a provider constructively denied a requested accommodation on this basis in turn flowed from the more general principle that "injury may result when a housing provider unreasonably delays responding to a request for an accommodation and that such delay may amount to a denial."  *Id.*  The court's discussion of this particular manner of concluding that a provider constructively denied a requested accommodation was not theoretical.  The court concluded its analysis of the first factor—"the extent to which Overlook delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit"—by noting that "were it not for additional factors that are present here, the Spencers would have presented a jury issue as to whether Overlook 'denied' their request."  *Id.*

Moving onto the second factor—"the state of the law at the time Overlook filed its complaint"—the court concluded that this factor weighed in favor of concluding that Overlook had not constructively denied the Spencers' request to keep Scooby.  *Id.* at 622-24.  This factor analyzes whether the state of the law justified the housing provider in turning to the courts for clarification rather than simply responding to the request.  *Id.*  The court focused on the legal issue that Overlook argued was in its favor: namely, whether a companion animal that lacks training could be a reasonable accommodation under the law.  *Id.* at 619, 622-23.  The district court concluded that because the law on this issue favored Overlook, "Overlook was well within its rights to get a court ruling on whether a dog that is the subject of a reasonable accommodation can be any companion animal."  *Id.* at 622 (brackets, ellipses, and internal quotation marks omitted).  In reaching this conclusion, the district court had relied on a case that "held that 'evidence of individual training' is required to show that a 'service animal' is a reasonable accommodation under the FHA."  *Id.* (quoting *Prindable v. Association of Apartment Owners of 2987 Kalakaua*, 304 F. Supp.2d 1245, 1256-57 (D. Haw. 2003), *aff'd on other grounds sub nom. DuBois v. Association of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 n.2 (9th Cir. 2005)).  Other cases cut against this holding, but the Sixth Circuit did "agree with the district court that there was at least some dispute in the law as to whether a 'service animal' required training and whether it had to

do more than provide comfort and companionship to qualify as an accommodation." *Id.* at 623.

But the "fact that the law is not entirely clear concerning a requested accommodation will not always justify a housing provider's filing suit rather than responding to a request." *Id.* Because "[a]ccommodations are often highly specific," there will often be "no case law that indicates a particular accommodation is required." *Id.* So merely "claiming that the law is 'unclear' should not entitle the provider to delay and obstruct the accommodation process." *Id.* But in *Overlook*, "Overlook could point to case law indicating that it was not required to treat Scooby"—a companion dog with no special training—"as an accommodation." *Id.* This "weigh[ed] against the reasonableness of a jury finding that its actions in seeking additional information and turning to the court for clarification constituted a denial of the Spencers' request." *Id.*

The third factor—whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation—similarly weighed in favor of concluding that Overlook had not constructively denied the Spencers' request. *See id.* at 621, 623. Although Overlook did not grant the Spencers a temporary exemption from its no-pets policy, "the more important fact" was that Overlook allowed Scooby to stay with the Spencers throughout the entire dispute. *Id.* at 623. And it never attempted to evict the Spencers or punish them for keeping Scooby. *Id.* So "Overlook's actions did not deny the Spencers the benefit of Scooby's company." *Id.*

In concluding, the court made another important point: "[a]s a general rule, housing providers should cooperate with residents to resolve disputes over reasonable accommodations rather than turning to the courts." *Id.* But because the second and third factors weighed against finding a constructive denial, the court held that Overlook's actions "did not constitute a denial of [the Spencers'] request for an accommodation." *Id.* at 624.

Now that the Court has explicated the three *Overlook* factors, the Court applies them to the present case. In analyzing the first factor—namely, the extent to which the housing provider delayed and obstructed the process of negotiation over the requested accommodation by filing the lawsuit—*Overlook* examined whether the information that the Spencers provided Overlook was sufficient for Overlook to make a decision about the requested accommodation. *Id.* at 622. The Fischers had certainly provided Sabal Palm enough information for it to rule on (and grant) their request. It bears emphasizing that unlike Lynsey, who had a mental and emotional disability that was not readily apparent, Deborah Fischer had a physical disability that was readily apparent

because she was confined to a wheelchair.  And the rule that *Overlook* adopted from the Joint Statement about the reliable information a housing provider may request in response to an accommodation request was predicated on the requestor having a disability that was not readily apparent, as was the case in *Overlook*.  *See id.* at 621; Joint Statement at 13.  So it is doubtful, to say the least, that Sabal Palm was entitled to the detailed medical information it requested concerning Deborah's physical disability.

But even setting aside that problem with Sabal Palm's actions and assuming that Sabal Palm was entitled to this medical information, Deborah provided it before Sabal Palm sued.  In December 2011, she gave Sabal Palm the following: (1) the medical-history form that Herzog, her primary-care doctor, completed as part of her application for a service animal through CCI, (ECF No. 82-6 at 82-6 at 2); and (2) the letter from the dog-training professional at CCI describing the tasks Sorenson was trained to help Deborah with.  The medical-history form unquestionably established that Deborah was disabled within the meaning of the FHA, and it further showed that her symptoms included a loss of strength, balance, and coordination in all of her extremities, including her hands.  It is self evident that a person with such a severe disability and with these symptoms would have difficulty grabbing and manipulating objects—abilities that are also self-evidently necessary to open and close doors, turn lights on and off, and retrieve items.  Since the dog-training letter established that Sorenson was trained to help Deborah open and close doors, turn lights on and off, and retrieve items, Sabal Palm had more than enough information to easily conclude that Deborah was entitled to the accommodation.

This is so even though none of the records the Fischers provided to Sabal Palm before it sued contain an express prescription, suggestion, recommendation, or other statement from a healthcare provider that Deborah needs a dog to assist her with her disability.  As noted previously, the medical-history form completed by Herzog implies that Deborah needs a service dog because Herzog says that Deborah would be a "good candidate" for a service dog through CCI. (ECF No. 82-6 at 3-8.) This implication is not foreclosed by the Fischers' failure to respond to Sabal Palm's Third Request for Admissions. But even if it were, that would not matter.  The implication is not necessary in order to conclude that Fischer is entitled to the accommodation under the FHA. The parties' dispute about whether the Fischers can fix their failure to respond to Sabal Palm's Third Request for Admissions is immaterial.  The Fischers' Motion (ECF No. 209) on this issue is **denied as moot**.

Sabal Palm points to no law that in order for Deborah to be entitled to the accommodation, she must be able to point to an express statement from a

healthcare provider that she needs a dog to assist her with her disability. That's because there is none. Although such a statement would suffice, it is not required. The Joint Statement requires that a disabled person simply "show[] the relationship between the person's disability and the need for the requested accommodation." Joint Statement at 13. As the present case demonstrates, that showing could be made without an express statement from a healthcare provider that the disabled person needs the dog. For example, if there is information connecting the service animal's training with the symptoms of the person's disability, then that would suffice: documentation of the disability-related need for the service animal "is sufficient if it establishes that an individual has a disability and that the animal in question will provide *some* type of disability-related assistance." HUD Statement at 4 (emphasis added). Even more explicit, the HUD Statement provides that a housing provider that has received an accommodation request must consider, among other things, this question: "Does the person making the request have a disability-related need for an assistance animal? In other words, *does the animal work, provide assistance, perform tasks or services* for the benefit of a person with a disability . . . *that alleviates one or more of the identified symptoms or effects of a person's existing disability.*" *Id.* at 3 (emphasis added). The information that Deborah provided to Sabal Palm in December 2011 shows that Sorenson is trained to perform tasks that alleviate one or more of her identified symptoms. Sabal Palm should therefore have granted her the accommodation in December 2011.

Yet even after receiving information that should have been dispositive, Sabal Palm took the legally unsupportable position in a February 2012 letter that it needed more information. Sabal Palm contended that she had not substantiated her need for a service dog: "you have not provided the Board with any medical records substantiating your need for the dog." (ECF No. 82-7 at 2.) So later in February 2012, Deborah gave them even more medical information substantiating her need for a dog. (ECF No. 82-8 at 2-11.)

All of these additional medical records tell a consistent story: Deborah's multiple sclerosis renders her severely disabled and requires that she have the assistance of others to maximize her functional status. The descriptions of the symptoms of her disability in these documents make it clear that a service dog trained to help retrieve items, open doors, and turn light switches on and off would help ameliorate the effects of her disability.

This information conclusively demonstrates that, contrary to Sabal Palm's contention, Deborah had provided Sabal Palm with medical records substantiating her need for a dog that could retrieve items, open doors, and

turn light switches on and off.[15]  She was disabled, needed assistance with all activities of daily living, and had specifically shown that her ability to grab and manipulate items—abilities that are necessary to retrieve items, open doors, and turn light switches on and off—were severely impacted by her disability. Moreover, her being confined to a wheelchair would also sometimes prevent her from retrieving items (for example, items on the floor).  And since she had provided evidence that Sorenson's training was specifically designed to help with these activities, she had amply established her disability-related need for Sorenson.

Given the dispositive nature of the information that it had received as far back as early December 2011, Sabal Palm's demands for even more information were unreasonable.  As *Overlook* concluded, an inquiry seeking qualifying-disability information, nexus information, or information describing the needed accommodation, "need not be highly intrusive."  Sabal Palm had already received detailed—and in the case of the medical records, confidential—information addressing these three points.  Asking for even more medical records providing nexus information was clearly "highly intrusive," and the intrusion was not necessary.  So the circumstances of the present case place it squarely within the following principle formulated by *Overlook*: "[i]n some circumstances, a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the process."  *Overlook*, 415 F. App'x at 622.  In sum, the first factor overwhelmingly weighs in favor of concluding that Sabal Palm constructively denied Deborah's requested accommodation.

The second *Overlook* factor—the state of the law at the time the suit was filed—also weighs in favor of concluding that the Fischers prevail on their refusal-to-accommodate claim as a matter of law.  This factor analyzes whether the state of the law justified the housing provider in turning to the courts for clarification rather than simply responding to the request.  *Id.* at 622-24. Based on Sabal Palm's Complaint and a letter from Trapani to the Fischers sent just five days after Sabal Palm sued, Sabal Palm believed at the time it filed suit that the law showed the following: that Sabal Palm was entitled to all

---

[15] Again, this analysis proceeds from the premise that Sabal Palm was entitled to obtain medical records substantiating Deborah's disability—a premise that is false because her disability was readily apparent.  *See* Joint Statement at 12-14; HUD Statement at 4.  Sabal Palm's position that it needed records to verify that a service dog would help with her disability is plausible, *see* Joint Statement at 13, but the records it received before suing were more than sufficient for it to verify that Deborah needed Sorenson.

of the medical records it requested in order to properly evaluate the accommodation; that it was within its rights to deny the accommodation because the Fischers failed to provide all the requested medical records; and that the records produced do not show that a dog in excess of 20 pounds is a reasonable or necessary accommodation. (*See* ECF No. 1 at ¶¶ 24-25, 28, 32, 36-37; ECF No. 82-9 at 2.)[16] Because Sabal Palm is mistaken about the law, this factor does not favor Sabal Palm. The Court analyzes each of Sabal Palm's beliefs about the law in turn.

Sabal Palm's first two beliefs—that it was entitled to all of the medical records it requested and that it was within its rights to deny Deborah the dog because she failed to provide all the requested medical records—must be reframed to properly analyze them. Because Deborah had provided Sabal Palm with medical and dog-training records before Sabal Palm sued, the question becomes whether the law supports Sabal Palm's contention that it was entitled to additional records and that it could deny her request because she failed to provide these additional records. As discussed above, the records Deborah provided were more than sufficient to verify that she had a disability that lay observers could see with their own eyes,[17] that some of the symptoms associated with her disability would make it difficult for her to pick up and manipulate items, and that Sorenson's training (retrieving items, opening and closing doors, and turning light switches on or off) would help alleviate some of the negative effects of her symptoms. Because Sabal Palm already had enough qualifying-disability and nexus information, Sabal Palm's request for additional records was excessive and unnecessary. The law is squarely against Sabal Palm on these beliefs.

So too with Sabal Palm's final belief—namely, that under the governing law, the records produced do not show that a dog in excess of 20 pounds is a

---

[16] Although Sabal Palm's Amended Complaint (ECF No. 129) was filed well after it sued, the Amended Complaint advances the same beliefs about the state of the law. (*Compare* ECF No. 129 at ¶¶ 21-22, 25, 29, 33-34, *with* ECF No. 1 at ¶¶ 24-25, 28, 32, 36-37.)

[17] Because Deborah's disability was readily apparent, Sabal Palm was not entitled to ask for medical records verifying her disability. Joint Statement at 12-14. A contrary result would be absurd. For example, a housing provider should not be able to demand that a blind person or a person confined to a wheelchair produce medical records supporting their disability. *Id.* Because Deborah's disability-related need for a dog was not readily apparent Sabal Palm was entitled to ask for information substantiating her need. Joint Statement at 13-14. But as discussed above, Deborah provided enough information to show the relationship between her disability and the need for a dog with Sorenson's specific training.

reasonable or necessary accommodation. The Court has already analyzed reasonableness and necessity and found that there is no dispute that the Fischers prevail on these elements as a matter of law.

In sum, the law at the time Sabal Palm sued is overwhelmingly in Deborah's favor. The second *Overlook* factor strongly weighs in favor of concluding that Sabal Palm constructively denied the Fischers' requested accommodation.

The third *Overlook* factor—whether the housing provider's delay in ruling on the accommodation request had the effect of depriving the disabled person of the accommodation—is the only factor that favors Sabal Palm. In its first communication in November 2011, Sabal Palm told the Fischers that they could "temporarily keep" Sorenson while Sabal Palm evaluated their accommodation request. (ECF No. 82-2 at 3.) Similarly, in the April 2012 letter just a few days after Sabal Palm brought the declaratory-judgment action, Sabal Palm told the Fischers that they could "temporarily keep" Sorenson while the lawsuit is pending. (ECF No. 82-9 at 3.) But in that same letter, Sabal Palm told them that it believed that it could lawfully deny their requested accommodation and require them to remove their dog. (*Id.* at 2.) So the Fischers have had to endure for almost two years knowing that Sabal Palm believed it could—and likely would, if given the opportunity—deny their request and force them to remove their dog. Because of this and because the other two factors strongly weigh in favor of concluding that Counter Defendants constructively denied the Fischers' accommodation request, the Court holds that the evidence is so one-sided that the Fischers prevail as a matter of law.

Sabal Palm unreasonably delayed ruling on the Fischers' accommodation request and therefore constructively denied it. By early December 2011 at the latest, Sabal Palm had received more than enough information to not just rule on the Fischers' request, but to grant it.[18] But instead of doing that, Sabal

---

[18] Deborah provided the letter from the dog-training professional and the picture of Sorenson and her in her wheelchair to Sabal Palm in a December 2, 2011 email. In a December 7, 2011 email, she provided Sabal Palm with the medical-history form completed by Herzog. These documents contained more than enough information to substantiate her accommodation request, especially when her disability was readily apparent. Remember, the inquiry by the housing provider "need not be highly intrusive. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary." *Overlook*, 415 F. App'x at 621-22. Deborah had provided medical and dog-training records with detailed information about her readily apparent disability and the tasks that the service

Palm refused to make a decision until the Fischers met its unreasonable and invasive demands for more information. And even when the Fischers provided more detailed medical information in February 2012, Sabal Palm still did not make a decision—let alone the legally correct decision. It instead sued in April 2012, and its Amended Complaint makes plain that Sabal Palm still thinks that it is entitled to even more information from Deborah. It characterized the documents she had provided as "*minimal*," and noted that she failed to provide *all* of the records it requested. (ECF No. 129 at 4-6 (emphasis added).) Sabal Palm's position is absurd. It should have granted Deborah's accommodation request shortly after receiving the records in December 2011.

To be sure, some delay between receiving the records and making a decision is inevitable. A housing provider will often and quite reasonably prefer to wait to consider a request along with supporting documents at the next upcoming board meeting. But in the present case, the board did consider Deborah's accommodation request and instead of granting it, decided to sue so that a Court could bless the decision Sabal Palm itself had reached: namely, that Deborah's request should be denied. (ECF No. 219-1 at 124, 137, 175.) When a requestor has provided enough information such that the only reasonable decision is to grant the request, a housing provider violates § 3604(f)(3)(B) by refusing to grant the request, demanding more information, and suing, even if the housing provider allows the requestor to temporarily keep the service animal while the lawsuit is pending.

A contrary conclusion leads to absurd results. For example, say a blind person requests to be allowed to keep a seeing-eye dog and objects to the housing provider's request for medical records proving that the person is blind and prescribing a seeing-eye dog. Under Sabal Palm's logic, the housing provider would not violate § 3604(f)(3)(B) when it sued to have a court determine whether it was entitled to the records it requested, so long as the housing provider allowed the blind person to temporarily keep the service animal while the suit is pending. That is not the law.

Or consider this case: a housing provider has enough information to grant a request—indeed, the information it has makes granting the request the only reasonable choice—but instead it sits on its laurels indefinitely, all the while demanding more information and only allowing the requestor to temporarily keep the service animal while it considers the request. Under Sabal Palm's logic, the housing provider would not have constructively denied the request even though the requestor must live with the annoyance and

---

dog was trained to perform. That these tasks would alleviate some of the negative effects of her disability was obvious.

harassment of requests for additional information and with the uncertainty of whether their request would be granted. The right to a valid and reasonable accommodation under the FHA necessarily implies that housing providers must make a decision. They cannot delay indefinitely.

Because it is clear in the present case that the request should be granted, continuing to delay for months and asking for even more information amounts to a constructive denial. The Fischers are therefore entitled to summary judgment on the issue of Sabal Palm's liability.[19]   The case will proceed against Sabal Palm on the issue of damages.

### 4.   *The merits as to Silvergold*

The only remaining question with respect to Silvergold's liability is whether his own actions make him liable as a matter of law. They do.

Individual board members or agents such as property managers can be held liable when they have "personally committed or contributed to a Fair Housing Act violation." *Falin v. Condominium Association of La Mer Estates, Inc.*, 2011 WL 5508654, at *3 (S.D. Fla. Nov. 9, 2011) (Cohn, J.); *accord Housing Opportunities*, 510 F. Supp. 2d at 1013-14. There is no genuine dispute that Silvergold personally contributed to Sabal Palm's refusal to reasonably accommodate Deborah. Silvergold testified in his deposition that, as the President of Sabal Palm's Board of Directors, he voted against Deborah being allowed to have Sorenson and to sue Deborah. (ECF No. 219-1 at 175.) Since Sabal Palm's refusal to simply grant her request to keep Sorenson is the basis of her refusal-to-accommodate claim, it follows that Silvergold personally contributed to the FHA violation. He therefore violated the FHA himself. The Court grants the Fischers summary judgment against Silvergold on the issue of liability. The case will proceed against him on the issue of damages.

---

[19] It is unclear whether Sabal Palm argues that its First Amendment right to petition the government renders it immune to the Fischers' refusal-to-accommodate claim. It asserts that it is immune from this claim in an argument heading. (ECF No. 202 at 18.) But in the body of the argument, Sabal Palm argues that it is immune from the Fischers' retaliation claim, not the refusal-to-accommodate claim. (*Id.* at 19; *see* ECF No. 265 at 16-17.) But even if Sabal Palm does argue that it is immune to the refusal-to-accommodate claim, this argument fails. Sabal Palm is immune from liability for suing the Fischers in the declaratory-judgment action. (*See* ECF No. 283 at 29-31.) But the refusal-to-accommodate claim is not based on Sabal Palm's suit; rather, it is based on Sabal Palm's failing to simply grant her request. Sabal Palm's lawsuit is but one of the ways it has delayed making the legally correct, easy, and straightforward decision.

**5.      *The merits as to Trapani***

The attempts to hold Trapani liable for Sabal Palm's decision to constructively deny Deborah's requested accommodation are unavailing.  The Fischers do not cite to a case where an attorney has been liable for a client's violation of the FHA.  And the Court has not found such a case.  Quite the contrary, the Court did find one case in which the Court rejected the attempt to hold an attorney liable under the FHA: "Plaintiff has asserted no legal theory by which an attorney representing a client in an eviction proceeding can be subjected to civil liability for discrimination under the FHA.  'A lawyer, like other agents, is not as such liable for acts of a client that make the client liable.'"  *Givens v. Wenker*, 2012 WL 1680099 at *7 (S.D. Ohio May 14, 2012) (quoting *Restatement (Third) of the Law Governing Lawyers*, Section 56 cmt. c (2000)).

The attempts to hold Trapani liable fail for a similar reason.  It is undisputed that Trapani is just Sabal Palm's attorney.  (ECF No. 200 at 3.)  He has no authority to vote—and did not in fact vote—on *Sabal Palm's* decision to sue Deborah instead of simply granting her requested accommodation. (*Id.* at 3-4.)  The decision to not affirmatively allow Deborah to keep Sorenson as an accommodation—i.e., constructive denial through delay and unreasonable requests for information—is the basis for Sabal Palm's liability.  Sabal Palm had more than enough information to make it clear that Deborah was legally entitled to keep Sorenson, but Sabal Palm did not grant her accommodation request.  Trapani had nothing to do with that decision.  Even if he rendered advice that Deborah was either not or likely not entitled to an accommodation—advice that admittedly would be very bad—that advice is not unlawful discrimination.  That occurred when Sabal Palm acted on that advice and voted to not grant Deborah's accommodation request.  Because Trapani had nothing to do with that vote and had no authority over Sabal Palm's decision, the unlawful action was fundamentally Sabal Palm's, not Trapani's.  Silvergold, on the other hand, affirmatively voted to deny Deborah's accommodation request and sue instead.  That's why Silvergold is liable and Trapani isn't.

Moreover, it would be a bad idea to subject the mere rendering of attorney advice to liability under the FHA because doing so would discourage attorneys from advising that the housing provider did not have to grant a request for fear that the attorney would be personally liable if the housing provider denied the request and discriminated in doing so.  But this conclusion does not mean that Trapani is free from all potential sanctions for what may have been very bad legal advice.  If an attorney's advice is so bad that they

commit legal malpractice, he or she can be sued by the client.  But that is obviously a different issue that can arise only in another forum, if at all.[20]

Trapani's motion for summary judgment on the Fischers' refusal-to-accommodate claim is therefore **granted**.

### C.  Sabal Palm's summary-judgment motion on the declaratory-judgment action

The discussion above establishes—at a minimum—two propositions that are fatal to Sabal Palm's summary-judgment motion on its declaratory-judgment action: (1) that Sabal Palm was not entitled to additional information beyond the records that Deborah produced before Sabal Palm voted to not grant the accommodation and sue and (2) that Sabal Palm should have granted Deborah's reasonable accommodation request after reviewing the records she provided in December 2011.  (The discussion also makes clear that reviewing the December records would be easy because they were not complicated to understand and they made it obvious that Deborah was entitled to keep Sorenson.)  The Court therefore **denies** Sabal Palm's motion for summary judgment on its declaratory-judgment action.

## Conclusion

For the above reasons, the Fischers' summary-judgment motion (ECF No. 225) is **granted in part and denied in part**; Sabal Palm's and Silvergold's summary-judgment motions (ECF Nos. 202, 228) on the Amended Counterclaim and Sabal Palm's summary-judgment motion (ECF No. 227) on its declaratory-judgment action are **denied**; and Trapani's summary-judgment motion (ECF No. 201) on the Amended Counterclaim is **granted**.  With respect to the Fischers' claims, Sabal Palm and Silvergold are liable on the Fischers' refusal-to-accommodate claim, but all claims against Trapani are gone.  The Court will enter an amended scheduling order reopening the period for dispositive motions so that the Fischers can move for summary judgment on

---

[20] The Court declines the Fischers' invitation to use Rule 56(d) of the Federal Rules of Civil Procedure to delay considering Trapani's summary-judgment motion (ECF No. 201) so that they can conduct further discovery.  Even in this request, the Fischers premise their argument on the bad advice potentially given by Trapani.  As discussed above, Trapani cannot be liable under the FHA for any bad advice that he gave. His liability for such bad advice would lie elsewhere.  And since the Fischers can point to no likelihood that discovery will reveal that Trapani was in fact on Sabal Palm's Board of Directors actually voting on the decisions significant to this case, the Fischers have not adduced a legally viable theory against Trapani.

the declaratory-judgment action.  In addition, the Court also **denies as moot** the Fischers' motion (ECF No. 209) seeking to fix their failure to respond to the third set of Sabal Palm's requests for admission.

      **Done and ordered** in chambers, at Miami, Florida, on March 19, 2014.

 

                                   **Robert N. Scola, Jr.**
                                   **United States District Judge**